

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 2, 2011



**BY HAND**

The Honorable John F. Keenan
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

    Re:  **United States v. Manssor Arbabsiar**
         **11 Cr. 897 (JFK)**

Dear Judge Keenan:

    On October 24, 2011, the Court entered a limited unsealing order permitting the Government to produce a complaint bearing docket number 11 Mag. 2534 (the "Sealed Complaint") in redacted form to defense counsel as part of the discovery process, but otherwise maintaining the Sealed Complaint, in its redacted and un-redacted forms, under seal.

    The Government respectfully requests that the Court enter an order permitting the redacted version of the Sealed Complaint, as it was produced to defense counsel, to be released to the public. The redacted Sealed Complaint is attached as Exhibit A. The Government makes this request because the redacted form of the Sealed Complaint adequately balances the Government's interest in protecting sensitive information from disclosure with the public's interest in accessing the document.



The un-redacted version of the Sealed Complaint, however, should remain under seal.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
Glen A. Kopp / Edward Y. Kim
Assistant United States Attorneys
(212) 637-2210 / 2401

SO ORDERED:

_John F. Keenan_  11/2/11
THE HONORABLE JOHN F. KEENAN
UNITED STATES DISTRICT JUDGE

Cc:     Sabrina Shroff, Esq.

# EXHIBIT A

**11 MAG 2534**

Approved: _____
GLEN KOPP/EDWARD KIM
Assistant United States Attorneys

Before:  HONORABLE JAMES C. FRANCIS IV
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- v. -

MANSSOR ARBABSIAR,

Defendant.

- - - - - - - - - - - - - - - - - X

**SEALED COMPLAINT**

Violations of

18 U.S.C. §§ 1117, 1958, 2, 2332a, 2332b

COUNTY OF OFFENSE: NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

James F. Walsh, Jr., being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### Conspiracy to Murder A Foreign Official

1. From at least in or about May 2011, up to and including the date of the filing of this Complaint, in the Southern District of New York and elsewhere, MANSSOR ARBABSIAR, the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed together and with each other to violate Section 1116 of Title 18, United States Code.

2. It was a part and an object of the conspiracy that MANSSOR ARBABSIAR, the defendant, and others known and unknown, would and did agree to kill a foreign official, to wit, ARBABSIAR agreed with others to kill the Ambassador to the United States of a particular Middle-Eastern country, while the Ambassador was located in the United States.

### Overt Acts

3. In furtherance of the conspiracy and to effect the illegal object thereof, MANSSOR ARBABSIAR, the defendant, and others known and unknown, committed the following overt acts, in the Southern District of New York and elsewhere:

a. On or about August 1, 2011, ARBABSIAR caused an overseas wire transfer of approximately $49,960 to be sent by a foreign entity from a bank located in a ▮▮▮▮ country to an FBI undercover bank account (the "UC Bank Account"). Before reaching the UC Bank Account, the funds were transferred through a bank in Manhattan, New York.

b. On or about August 9, 2011, ARBABSIAR caused an overseas wire transfer of approximately $49,960 to be sent by another foreign entity from a bank located in a ▮▮▮▮ country to the UC Bank Account. Before reaching the UC Bank Account, the funds were transferred through a bank in Manhattan, New York.

(Title 18, United States Code, Section 1117.)

## COUNT TWO
### Foreign Travel and Use of Interstate and Foreign Commerce Facilities in the Commission of Murder-For-Hire

4. From at least in or about May 2011, up to and including the date of the filing of this Complaint, in the Southern District of New York and elsewhere, MANSSOR ARBABSIAR, the defendant, willfully and knowingly traveled in foreign commerce and used, and caused another to use, a facility of interstate and foreign commerce, to wit, bank wire transfers to an account in the United States from foreign entities, with the intent that a murder be committed in violation of the laws of the United States, to wit, Title 18, United States Code, Sections 1116 and 1117, as consideration for the receipt of, and as consideration for a promise and agreement to pay anything of pecuniary value, as those terms are defined in Title 18, United States Code, Section 1958(b), to wit, ARBABSIAR caused to be wired approximately $100,000 into the United States, to a confidential source working for the Drug Enforcement Administration, as consideration for the murder of the Ambassador to the United States of a particular Middle-Eastern country.

(Title 18, United States Code, Sections 1958 and 2.)

## COUNT THREE
### Conspiracy to Engage in Foreign Travel and Use Interstate and Foreign Commerce Facilities In the Commission of Murder-For-Hire

5. From at least in or about May 2011, up to and including the date of the filing of this Complaint, in the Southern District of New York and elsewhere, MANSSOR ARBABSIAR, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to violate Title 18, United States Code, Section 1958.

6. It was a part and an object of the conspiracy that MANSSOR ARBABSIAR, the defendant, and others known and unknown, would and did agree together and with each other to travel in foreign commerce and to use the facilities of interstate and foreign commerce, to wit, bank wire transfers to an account in the United States from foreign entities, with the intent that a murder be committed in violation of the laws the United States, as consideration for the receipt of, and as consideration for a promise and agreement to pay anything of pecuniary value, to wit, ARBABSIAR, and others known and unknown, caused to be paid approximately $100,000 to a confidential source of the Drug Enforcement Administration in exchange for an agreement to commit the murder of the Ambassador to the United States from a particular Middle-Eastern country, in violation of Title 18, United States Code, Sections 1116 and 1117.

### Overt Acts

7. In furtherance of the conspiracy and to effect the illegal objects thereof, MANSSOR ARBABSIAR, the defendant, and others known and unknown, committed in the Southern District of New York and elsewhere, the acts set forth in Paragraph 3, above.

(Title 18, United States Code, Section 1958.)

## COUNT FOUR
### Conspiracy To Use A Weapon of Mass Destruction

8. From at least in or about May 2011, up to and including the date of the filing of this Complaint, in the Southern District of New York and elsewhere, MANSSOR ARBABSIAR, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to violate Title 18, United States Code, Section 2332a(a)(2)(A) and (C).

9. It was a part and an object of the conspiracy that MANSSOR ARBABSIAR, the defendant, and others known and unknown, would use a weapon of mass destruction, namely, a destructive device as that term is defined in Title 18, United States Code, Section 921, against a person within the United States, where a facility of interstate and foreign commerce was used in furtherance of the offense, to wit, bank wire transfers to an account in the United States from foreign entities, and where a perpetrator of the offense traveled in foreign commerce in furtherance of the offense, to wit, ARBABSIAR agreed with others to use an explosive device against the Ambassador to the United States of a particular Middle-Eastern country.

### Overt Acts

10. In furtherance of the conspiracy and to effect the illegal objects thereof, MANSSOR ARBABSIAR, the defendant, and others known and unknown, committed in the Southern District of New York and elsewhere, the acts set forth in Paragraph 3, above.

(Title 18, United States Code, Section 2332a(a)(2)(A) and (C).)

### COUNT FIVE
### Conspiracy to Commit An Act of Terrorism
### Transcending National Boundaries

11. From at least in or about May 2011, up to and including the date of the filing of this Complaint, in the Southern District of New York and elsewhere, MANSSOR ARBABSIAR, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to violate Title 18, United States Code, Sections 2332b(a)(1)(A), (a)(1)(B), (b)(1)(A) and (b)(1)(B).

12. It was a part and an object of the conspiracy that MANSSOR ARBABSIAR, the defendant, and others known and unknown, would kill and maim persons within the United States and would create a substantial risk of serious bodily injury to others by destroying and damaging structures, conveyances and other real and personal property within the United States, in violation of the laws of the United States, including Title 18, United States Code, Sections 1116 and 1117, where interstate and foreign commerce is used in furtherance of the offense, to wit, bank wire transfers to an account in the United States from foreign entities, and where the offense would have obstructed, delayed and affected interstate commerce had it been consummated, to wit, ARBABSIAR, during meetings in Mexico, agreed with others to kill

the Ambassador to the United States of a particular Middle-Eastern country, while the Ambassador was in the United States.

### Overt Acts

13. In furtherance of the conspiracy and to effect the illegal objects thereof, MANSSOR ARBABSIAR, the defendant, and others known and unknown, committed in the Southern District of New York and elsewhere, the acts set forth in Paragraph 3, above.

(Title 18, United States Code, Section 2332b(a)(1)(A), (a)(1)(B), (a)(2), (b)(1)(A), (b)(1)(B).)

The bases for my knowledge and the foregoing charges are, in part, as follows:

14. I have been a Special Agent with the FBI since September of 2004. I have participated in the investigation of this matter, and have spoken with other individuals, including other law-enforcement officials, about this investigation. The facts and circumstances of this investigation have been summarized for the specific purposes of the instant affidavit. No attempt has been made to set forth the complete factual history of this investigation or all of its details.

15. I make this affidavit based on, among other things, my personal review of evidence obtained in the course of the investigation, as well as information and belief. The sources of my information and belief include, but are not limited to, conversations with other law-enforcement officers; reviews of reports and other documents prepared by law-enforcement personnel; reviews of business records; and draft transcripts of recordings, as well as the underlying recordings themselves. Where the actions, statements and conversations of others, or the contents of documents, are recounted or described herein, they are related in substance and in part, unless otherwise indicated.

### I. OVERVIEW

16. As set forth more fully below, MANSSOR ARBABSIAR, the defendant, a citizen of the United States born in Iran, and his Iran-based co-conspirators, have been plotting the murder of the Ambassador to the United States ("Ambassador") of a particular Middle-Eastern country ("Middle Eastern Country #1"). In furtherance of this conspiracy, ARBABSIAR has met on a number of occasions in Mexico with a Drug Enforcement Administration confidential source ("CS-1"). In the course of these meetings, CS-1 has posed as an associate of a sophisticated and violent

-5-

international drug-trafficking cartel. See infra n.2. ARBABSIAR has arranged to hire CS-1 and his men to murder the Ambassador, and ARBABSIAR has caused approximately $100,000 to be wired into a bank account in the United States for CS-1 — as a down-payment to CS-1 for his anticipated killing of the Ambassador.

## II. THE INVESTIGATION

### A. MAY 2011: ARBABSIAR MEETS CS-1 AND DISCUSSES WITH HIM THE POSSIBILITY OF AN ATTACK

17. On May 24, 2011, according to travel records, MANSSOR ARBABSIAR, the defendant, traveled back and forth from Texas to Mexico. In Mexico, ARBABSIAR met with CS-1.[1] During this May 24 meeting, and all others with ARBABSIAR, CS-1 posed as an associate of a drug-trafficking cartel ("Drug Cartel #1").[2] After the May 24 meeting with ARBABSIAR, CS-1 described to law-enforcement agents what had transpired. CS-1 explained that, at the meeting, ARBABSIAR inquired as to CS-1's knowledge, if any, with respect to explosives. According to CS-1, ARBABSIAR explained to CS-1 that he was interested in, among other things, attacking an embassy of Middle-Eastern Country #1. In response, and to further the discussion, CS-1 told ARBABSIAR that he was indeed knowledgeable with respect to C-4 explosives.[3]

---

[1] CS-1 is a paid confidential source. Previously, CS-1 was charged in connection with a narcotics offense and charged by authorities of a certain state ("State"). In exchange for CS-1's cooperation in various narcotics investigations, the State charges were dismissed. CS-1 has previously provided reliable and independently corroborated information to federal law-enforcement agents; this information has led to numerous seizures of narcotics. In addition, CS-1 has been paid by federal law-enforcement officials in connection with the work he has done.

[2] Drug Cartel #1 is a large, sophisticated, and violent drug-trafficking cartel. Its principal places of operation are Mexico and the United States. According to published reports, Drug Cartel #1 has access to military-grade weaponry and explosives, and has engaged in numerous acts of violence, including assassinations and murders.

[3] "C-4" is a type of plastic explosive. Like other plastic explosives, C-4 can generally be molded, so that it can be shaped and formed with a certain degree of precision.

          18.  On May 30, 2011, according to travel records, MANSSOR ARBABSIAR, the defendant, traveled internationally, by plane from Houston, Texas.

     B.   JUNE AND JULY 2011:
          ARBABSIAR RETURNS TO MEXICO AND HIRES CS-1 TO KILL
          THE UNITED STATES-BASED AMBASSADOR OF MIDDLE-EASTERN
          COUNTRY #1

          19.  On June 23, 2011, MANSSOR ARBABSIAR, the defendant, who had traveled internationally, see supra ¶ 18, returned by plane to Mexico.

          20.  According to CS-1, MANSSOR ARBABSIAR, the defendant, again met with CS-1 in Mexico in late June and July. Over the course of a series of meetings, ARBABSIAR explained to CS-1 that his associates in Iran had discussed a number of violent missions for CS-1 and CS-1's purported criminal associates to perform. These included, among others, the murder of the Ambassador.

          21.  On or about July 14, 2011, MANSSOR ARBABSIAR, the defendant, met with CS-1 in Mexico. At the direction of law-enforcement agents, CS-1 made an audio recording of the meeting. CS-1 and ARBABSIAR spoke English during the meeting. Based on my review of draft transcripts of the July 14 recorded conversation, I learned that at this meeting the following occurred, among other things:

               a.  CS-1 told ARBABSIAR that CS-1 would need to use "[a]t least four guys" and that CS-1 was "talking to one of the guys" and would "take the one point five for the [Middle-Eastern Country #1] [.]" I understand this to mean that CS-1 would need to use four men to assassinate the Ambassador and that the cost to ARBABSIAR of conducting the assassination would be $1.5 million.[4] CS-1 told ARBABSIAR that he would "go ahead and work on [Middle-Eastern Country #1], get all the information that we can"; ARBABSIAR agreed that the assassination of the Ambassador should be handled first.[5] After CS-1 stated "you just

---

     [4] Both above, and throughout, the quoted language is taken from the draft transcripts. My understanding of the meaning of those quoted terms, where supplied, is based on my training, experience and participation in this investigation.

     [5] Prior to the July 14, 2011 meeting, CS-1 had reported that he and ARBABSIAR had discussed the possibility of attacks on

want the, the main guy," ARBABSIAR confirmed that he just wanted the "[A]mbassador" — which I understand to mean that ARBABSIAR wanted CS-1 to arrange for the assassination of the Ambassador before executing the other attacks they had discussed.

        b.   CS-1 and ARBABSIAR then discussed how ARBABSIAR would pay CS-1. ARBABSIAR asked CS-1 what bank he planned to use, and CS-1 stated that he would give ARBABSIAR "an account number." At a later time during the same conversation, ARBABSIAR stated that the "money is [in] Iran," and that he (ARBABSIAR) had received a call indicating that the money would be at his brother's house. When ARBABSIAR called his brother, "he [ARBABSIAR's brother] said he had it there" and that he [ARBABSIAR's brother] had received "the money at nine in the morning." ARBABSIAR said the "money's a hundred thousand" but that he (ARBABSIAR) would have to "send a hundred . . . ten thousand, ten thousand, ten thousand. I don't wanna send it to one guy, one shot." I understand ARBABSIAR to mean that he had $100,000 in Iran to pay CS-1 as a first payment toward the assassination of the Ambassador, but that ARBABSIAR wanted to send the money to CS-1 in installments and not in a single transfer.

        c.   During their July 14 meeting, CS-1 asked ARBABSIAR about a particular individual ("CC-1"), who, according to ARBABSIAR, was located in Iran and had requested that ARBABSIAR find someone (ultimately, CS-1) who could carry out the attack on the Ambassador described above. ARBABSIAR explained that CC-1 was "wanted in America," had been "on the CNN," and was a "big general in [the] army." ARBABSIAR further explained that there were a number of parts to the army of Iran and that CC-1 "work[s] in outside, in other countries for the Iranian government[.]" ARBABSIAR further explained that CC-1, who ARBABSIAR said was related to him, did not wear a uniform or carry a gun, and had taken certain unspecified actions related to a bombing in a particular country. In the portions of the July 14 meeting referenced in this sub-paragraph, I understand ARBABSIAR to be saying that CC-1 works for the military of Iran in some capacity, and that CC-1 focuses on matters outside of Iran.

---

a number of other targets. Some of these targets were in the United States, including foreign government facilities in New York, while others were in a named ▓▓▓▓▓▓▓▓▓▓ country; some of the attacks discussed involved Middle-Eastern Country #1, others involved another named ▓▓▓▓▓▓▓ Country ▓▓▓▓.

d. At the end of the July 14 meeting, CS-1 told ARBABSIAR, "[w]e're gonna start doing the guy," which I understand to mean that CS-1 and ARBABSIAR confirmed that CS-1 would proceed to plan the assassination of the Ambassador.

22. On or about July 17, 2011, MANSSOR ARBABSIAR, the defendant, met with CS-1 — again, see supra ¶ 21, in Mexico. At the direction of law-enforcement agents, CS-1 recorded the meeting. CS-1 and ARBABSIAR spoke English during the meeting. Based on my review of draft transcripts of the July 17 meeting, I learned that at this meeting the following occurred, among other things:

a. CS-1 made reference to "my guy over there . . . he's already in Washington," which I understand to be a reference to the fact that one of CS-1's workers had purportedly already traveled to Washington, D.C. to surveill the Ambassador. CS-1 then asked, "I got this on the computer . . . is this the guy right here?" — to which ARBABSIAR replied, "Yeah, that's him." Based, among other things, on my discussions with other agents, I understand that during this portion of the conversation, CS-1 showed ARBABSIAR a photograph of the Ambassador.

b. CS-1 described what he had purportedly begun to learn about the Ambassador, stating that the Ambassador has "eight to seven security people around him . . . [h]e goes out and eat like two times a week in a restaurant . . . [m]y guy is already over there . . . doing surveillance." CS-1 then reflected "I don't know what exactly [CC-1] [see supra ¶ 21(c)[6]] wants me to do. . . ." After some further conversation, ARBABSIAR replied: "[h]e wants you to kill this guy." CS-1 then explained "there's gonna be like American people there . . . in the restaurant. You want me to do it outside or in the restaurant?" ARBABSIAR answered: "[d]oesn't matter how you do it. I mean, if you do it by himself, kill is better, but . . . sometime, you know, you have no choice, is that right?" I understand ARBABSIAR and CS-1 to have been discussing how the Ambassador should be killed, and ARBABSIAR to be saying that CC-1 wanted the Ambassador killed; without bystander casualties if possible ("by himself, kill is better") but not if operational necessities dictated otherwise ("sometime, you know, you have no

---

[6] During the course of the July 17 conversation, ARBABSIAR further described CC-1. ARBABSIAR said that CC-1 was "working for [the] government [presumably, of Iran] but he's working outside. . . . He's working like . . . [l]ike [an intelligence agency]."

choice").[7]

c. On a number of occasions, ARBABSIAR re-assured CS-1 that CS-1 and his (CS-1's) men would indeed be paid for killing the Ambassador. ARBABSIAR told CS-1 to tell the people working for him (CS-1) that he (ARBABSIAR) could "guarantee the money. . . I [ARBABSIAR] got the money coming." ARBABSIAR emphasized that "this is politics, ok . . . it's not like, eh, personal . . . This is politics, so these people [ARBABSIAR's co-conspirators in Iran] they pay this government . . . he's got [CC-1 has got] the, got the government behind him . . . . he's not paying from his pocket." To facilitate payment, at one point during the July 17 meeting, CS-1 gave ARBABSIAR "the account number . . . in ▌▌▌▌ Bank . . . and the U.S. routing number" — the unique number associated with the United States bank account into which ARBABSIAR could arrange for payment to be made to CS-1 for the assassination of the Ambassador.

d. At the end of the July 17 meeting, ARBABSIAR declared "[l]et it hit the restaurant. If, if you can do it outside, do it. If not, restaurant, hit it, it's ok," by which I understand ARBABSIAR to mean that if CS-1 could not assassinate the Ambassador outside the restaurant, he should "hit" or bomb the restaurant. In response, CS-1 then noted that there were "from a hundred, a hundred and fifty [people in the restaurant]" and "buildings on the sides," and "senators [U.S. Senators who dine there]," all of which ARBABSIAR dismissed as "no problem" or "no big deal," meaning that the potential for such casualties should not dissuade CS-1 from killing the Ambassador.

C. **JULY AND AUGUST 2011: THE FIRST PAYMENTS ARE MADE**

23. According to travel records, MANSSOR ARBABSIAR, the defendant, traveled from Mexico, departing for a foreign

---

[7] On numerous occasions during the July 17 meeting, ARBABSIAR made it clear that the assassination needed to go forward, even if doing so would cause mass casualties. For example, ARBABSIAR said: "They want that guy [the Ambassador] done [killed], if the hundred go with him, fuck 'em." In a similar vein, ARBABSIAR and CS-1 also discussed the means by which the Ambassador would be killed. CS-1 said: "I'm gonna blow him [the Ambassador] up or shoot him, whatever you want." ARBABSIAR responded: "Yeah, it doesn't matter . . . [w]hatever is easy for . . . how is possible for you."

country on or about July 20, 2011.[8]

24. As noted above, see supra ¶ 22, at the July 17 meeting, CS-1 provided MANSSOR ARBABSIAR, the defendant, with a bank account and routing number, so that payment could be made for the assassination of the Ambassador. The account information CS-1 provided was in fact associated with an FBI undercover account (the "UC Bank Account").

25. On or about August 1, 2011, an overseas wire transfer of approximately $49,960 was sent by a foreign entity ("Foreign Entity-1") from a bank located in a ▇▇▇ country (the ▇▇▇ Bank") through a bank in Manhattan to the UC Bank Account.

26. On or about August 6, 2011, MANSSOR ARBABSIAR, the defendant, spoke with CS-1 on the telephone. CS-1 recorded the conversation. Based on my review of draft transcripts of the recorded conversation, I know that during the call, ARBABSIAR asked CS-1 whether he (ARBABSIAR) had "already finished the other half of . . . the money." ARBABSIAR replied, "I sent it yesterday." I understand that ARBABSIAR was acknowledging that the previous day he sent to CS-1 the second half of the approximately $100,000 down-payment, see supra ¶ 21(b), for the murder of the Ambassador. I understand that "the other half" of the $100,000 was received on or about August 9, 2011, see infra ¶ 27, and that the first "half" was received on or about August 1, 2011, see supra ¶ 24.

27. On or about August 9, 2011, an overseas wire transfer of approximately $49,960 was sent by another foreign entity ("Foreign Entity-2") from the ▇▇▇ Bank through a bank in Manhattan to the UC Bank Account.

28. On or about August 11, 2011, MANSSOR ARBABSIAR, the defendant, spoke with CS-1 on the telephone. CS-1 recorded the conversation. Based on my review of draft transcripts of the recorded conversation, I know that during the call, ARBABSIAR asked CS-1, "Did you check the bank?" CS-1 responded in the affirmative, "I check in the bank, everything is there." I understand that ARBABSIAR was confirming that CS-1 received the $49,960 that arrived in the UC Bank Account on or about August 9,

---

[8] Three days prior to ARBABSIAR's July 20 flight, during the July 17 meeting with CS-1, see supra, ARBABSIAR indicated to CS-1 that ARBABSIAR would be traveling to Iran on July 20 to see CC-1.

2011.

29. On or about September 2, 2011, MANSSOR ARBABSIAR, the defendant, spoke with CS-1 on the telephone. CS-1 recorded the conversation. Based on my review of draft transcripts of the recorded conversation, I know that during the call, ARBABSIAR asked CS-1 if the "building is getting painted" and CS-1 responded "we're still doing that." I understand that by asking that question, ARBABSIAR was asking CS-1 whether the arrangements to kill the Ambassador were still underway.[9] ARBABSIAR then stated, "once we do this one, you gonna open a [U/I] like, uh . . . you got the number for the safe" and "[o]nce you open the door, that's it. You know what I mean? . . . [y]ou don't have to worry about anything." I understand that ARBABSIAR was explaining to CS-1 that after CS-1 and his team assassinate the Ambassador, CS-1 will make money from that and other projects with ARBABSIAR and his associates.

30. On or about September 12, 2011, MANSSOR ARBABSIAR, the defendant, spoke with CS-1 on the telephone. CS-1 recorded the telephone conversation. Based on my review of a draft transcript of the recording, I learned that ARBABSIAR told CS-1 that "the number is gonna stay the same thing . . . [o]ne and a half . . ." I understand ARBABSIAR to be stating that CS-1 will receive the same amount of money ("[o]ne and a half": $1.5 million) for the assassination that ARBABSIAR and CS-1 had previously discussed. See supra ¶ 21(a). ARBABSIAR also referred to "the number we did" and told CS-1 that he could "prepare for those too . . . but we need to at least one of them." I understand ARBABSIAR to be informing CS-1 that in the future CS-1 can prepare for the additional attacks previously proposed, see supra n.5, but that CS-1 first needs to assassinate the Ambassador. ARBABSIAR promised CS-1 that if he does "at least one . . . I'll send the balance for you," which I understand to mean that CS-1 would receive the remainder of his $1.5 million payment after the Ambassador has been assassinated. ARBABSIAR also stated "[t]he first one they just want it . . . for test" which I understand to mean that CS-1's first task was designed as a test run, with future assignments to follow if the assassination was successful.

---

[9] Based on my training and in my experience, individuals who speak explicitly about criminal activity during in-person meetings, see, e.g., supra ¶¶ 21, 22, often speak in coded language during telephone conversations, in an effort to conceal the subject matter of their discussions in the event that they are overheard or intercepted.

31. On or about September 20, 2011, MANSSOR ARBABSIAR, the defendant, spoke with CS-1 on the telephone. CS-1 recorded the telephone conversation. Based on my review of a draft transcript of the recording, I learned that CS-1 told ARBABSIAR, "I'm ready for the . . . for the thing, for the house, man, to be painted but . . . I need to, I need, either I need you or I need half of the . . . of the check that we're gonna receive to . . . so I can go ahead and . . . be finished with the job." I understand that CS-1 is requesting that ARBABSIAR either pay one-half of the agreed upon price ($1.5 million, see supra ¶ 21(a)) for the murder of the Ambassador or go personally to Mexico as collateral for the final payment of the fee for the assassination.[10] Based on my training and experience, I know that this form of guarantee is common for large scale illicit transactions. Ultimately, based on my review of the transcript of the September 20, 2011 call, I believe that ARBABSIAR agreed to travel to Mexico per CS-1's request to guarantee payment for the murder of the Ambassador ("I'm gonna go over there two three days, I'll go over there. . . . Don't wait for me. Get ready, but I'll be over there."). Later during the night of September 20, CS-1 returned a call from ARBABSIAR. At the direction of law-enforcement agents, CS-1 recorded the telephone conversation. During the call, ARBABSIAR inquired as to "how long [he] need[s] to stay in Mexico." I understand that ARBABSIAR is asking about how long he would have to stay in Mexico to supply a sufficient guarantee for payment to CS-1 and CS-1's associates following completion of the plot to murder the Ambassador of Middle-Eastern Country #1.

32. On or about September 28, 2011, MANSSOR ARBABSIAR, the defendant, boarded a plane in a foreign country, bound for Mexico.

---

[10] CS-1 initially requested that ARBABSIAR send someone to Mexico as collateral in a recorded call between CS-1 and ARBABSIAR on or about August 28, 2011.

WHEREFORE, deponent respectfully requests that a warrant issue for the arrest of MANSSOR ARBABSIAR, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

_____
James F. Walsh, Jr.
Special Agent
Federal Bureau of Investigation


Sworn to before me this
28th day of September, 2011

_____
HONORABLE JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

-14-