UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                               :
UNITED STATES OF AMERICA,
                                               :    11 Cr. 897 (JFK)
     - v. -
                                               :
MANSSOR ARBABSIAR,
    a/k/a "Mansour Arbabsiar,"                  :

                    Defendant.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

                                    PREET BHARARA
                                    United States Attorney for the
                                    Southern District of New York
                                    One St. Andrew's Plaza
                                    New York, New York 10007

Edward Y. Kim
Glen A. Kopp
Stephen J. Ritchin

Assistant United States Attorneys
        -Of Counsel-

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing for Manssor Arbabsiar, currently scheduled for May 6, 2013, at 10:45 a.m. For the reasons set forth herein, the Government contends that the defendant's extremely serious crime calls for the statutory maximum sentence of 25 years' imprisonment, the same sentence recommended by the United States Probation Department. The defendant conspired with members of an elite unit of the Iranian military to assassinate the Saudi Arabian Ambassador to the United States in Washington, D.C., an act the defendant understood would likely result in mass casualties. The seriousness of this offense and importance of deterrence in this context cannot be overstated. For these reasons, and as further explained below, the defendant's conduct warrants a 25-year sentence, and that is the sentence that should be imposed in this case.

## BACKGROUND

### I. General Overview[1]

#### A. The Plot to Assassinate the Ambassador

The defendant Manssor Arbabsiar, a/k/a "Mansour Arbabsiar," and his Iranian military co-conspirators, including Gholam Shakuri, a member of the Islamic Republic Guards Corps - Qods Force, plotted the murder of the Saudi Arabian Ambassador to the United States (the "Ambassador"). (PSR ¶ 9). In order to ensure the success of this plot, Arbabsiar met on a number of occasions in Mexico with a Drug Enforcement Administration (DEA) confidential source ("CS-1"). (*Id.*). In the course of these meetings, CS-1 posed as an associate of a sophisticated and violent international drug trafficking cartel. (*Id.*). Arbabsiar arranged to hire

---

[1] All citations to the Presentence Investigation Report ("PSR") in this section refer to the Offense Conduct section of the PSR.

CS-1 and his purported criminal associates to murder the Ambassador in Washington, D.C., and Shakuri and other Iranian military co-conspirators were aware of and approved the plan. (*Id*.).

**B.    Arbabsiar's Iranian Co-Conspirators**

The Iranian Islamic Revolutionary Guard Corps (the "IRGC") is Iran's paramilitary force and answerable to Iran's supreme leader. (PSR ¶ 10). The IRGC is composed of a number of branches, including the Qods Force. (*Id*.). The Qods Force conducts sensitive covert operations outside of Iran, including terrorist attacks, assassinations, and kidnappings, and provides weapons and training to Iran's terrorist and militant allies. (*Id*.). Among many other things, the Qods Force is believed to have sponsored attacks against Coalition Forces in Iraq. (*Id*.). In October 2007, the United States Treasury Department designated the Qods Force as a terrorist supporter, pursuant to Executive Order 13224, for providing material support to the Taliban and other terrorist organizations. (*Id*.).

**II.    Arbabsiar's Recruitment by His Cousin in Iran**

In the early spring of 2011, while Arbabsiar was in Iran visiting his family, his cousin approached him and asked Arbabsiar to work with him. (PSR ¶ 11). Arbabsiar had long understood that his cousin (hereinafter "Iranian Official #1"), was a high-ranking member of the Qods Force. (*Id*.). Arbabsiar told Iranian Official #1 that as a result of his business in both Mexico and the United States, Arbabsiar knew a number of people who traveled between the two countries, and that he believed that some of those people were narcotics traffickers. (*Id*.). Iranian Official #1 told Arbabsiar that he wanted Arbabsiar to hire someone who could kidnap the Ambassador and that Arbabsiar should find someone in the narcotics business, because people in that business are willing to undertake criminal activity in exchange for money. (*Id*.). In addition to the plot to attack the Ambassador, Iranian Official #1 told Arbabsiar that there

could be additional assignments following the Ambassador job, including attacks on embassies in the United States and elsewhere. (*Id*.). According to Iranian Official #1, the plot against the Ambassador, however, was the priority mission. (*Id*.).

After Arbabsiar met with Iranian Official #1 and received instructions to kidnap the Ambassador, Iranian Official #1 advised Arbabsiar that he was leaving Iran and would be placing his deputy, co-defendant Gholam Shakuri, in charge of handling Arbabsiar for the mission. (PSR ¶ 12). Thereafter, in Tehran, Arbabsiar met with Shakuri for the first time. Shakuri instructed Arbabsiar to find a person to carry out the plot against the Ambassador and told Arbabsiar that the Qods Force would provide Arbabsiar with anything he needed to accomplish his mission. (*Id*.). About a week after meeting with Shakuri, Arbabsiar left Iran for Texas. (PSR ¶ 13).

### III.  Arbabsiar's Meetings with the Confidential Source to Plan the Assassination of the Ambassador

#### A.  May 2011: Arbabsiar's Initial Meeting with CS-1

On May 24, 2011, Arbabsiar traveled from Texas to Mexico and met with a Drug Enforcement Administration ("DEA") confidential source ("CS-1") in Mexico. (PSR ¶ 14). Arbabsiar had been looking for someone to carry out the operation against the Ambassador. He was able to make contact with CS-1 through someone Arbabsiar had known previously in Texas. During this meeting, and all others with Arbabsiar, CS-1 posed as an associate of a drug-trafficking cartel. (*Id*.). Arbabsiar inquired as to CS-1's knowledge of explosives. (*Id*.). Arbabsiar explained to CS-1 that he was interested in, among other things, attacking an embassy of Saudi Arabia. CS-1 responded that he was knowledgeable with respect to C-4 explosives. (*Id*.).

After Arbabsiar's initial meeting with CS-1, Arbabsiar returned to Texas and then left the United States about a week later.   (PSR ¶ 15).

## B.      Arbabsiar Returns to Iran and Meets with Shakuri

Following his return to Iran, Arbabsiar met with Shakuri to report on his meeting with CS-1.  (PSR ¶ 16).  Arbabsiar indicated to Shakuri that he had located a drug dealer in Mexico who could carry out their plan to take action against the Ambassador.  (*Id.*).  Shakuri instructed Arbabsiar to return to Mexico to finalize the deal with CS-1 for the operation involving the Ambassador.  (*Id.*).  Shakuri further advised Arbabsiar to move quickly because the operation needed to be accomplished with haste in order to put pressure on the Saudis. (*Id.*).  A few weeks later, Arbabsiar again left Iran for Mexico.  (*Id.*).

## C.      June and July 2011: Arbabsiar Meets Again with CS-1

On June 23, 2011, Arbabsiar returned to Mexico.  (PSR ¶ 17).  In late June and July, Arbabsiar met again with CS-1 in Mexico.  (*Id.*).  Over the course of a series of meetings, Arbabsiar explained to CS-1 that his military associates in Iran had discussed a number of violent missions for CS-1 and CS-1's purported criminal associates to perform, including the murder of the Ambassador.   (*Id.*).

On July 14, 2011, Arbabsiar met again with CS-1 in Mexico.  (PSR ¶ 18).  CS-1 recorded the meeting at the direction of the DEA.  (*Id.*).  During this meeting, CS-1 told Arbabsiar that he would need a team of at least four men to assassinate the Ambassador and that the price for conducting the assassination would be $1.5 million.  (*Id.*).  CS-1 and Arbabsiar also discussed the method by which Arbabsiar would pay CS-1.  (*Id.*).  Arbabsiar then said that he had been told that $100,000 was available in Iran to pay CS-1 as a first installment toward the assassination of the Ambassador.  (*Id.*).  During the course of the meeting, Arbabsiar stated that his cousin

worked in other countries on behalf of the Iranian government and had requested that Arbabsiar find someone who could carry out the plot to kill the Ambassador. (*Id.*).

On July 17, 2011, Arbabsiar met again with CS-1 in Mexico. (PSR ¶ 19). During the meeting, after Arbabsiar identified a photograph of the Ambassador, CS-1 informed Arbabsiar that one of CS-1's associates had already traveled to Washington, D.C. to surveil the Ambassador. (*Id.*). CS-1 asked exactly what Arbabsiar's cousin wanted him to do, and Arbabsiar stated that his cousin wanted CS-1 to kill the Ambassador. (*Id.*). Arbabsiar also said that it would be permissible for CS-1 to kill the Ambassador even if it resulted in bystander casualties. (*Id.*). CS-1 explained to Arbabsiar, "there's gonna be like American people there . . . in the restaurant. You want me to do it outside or in the restaurant?" (*Id.*). Arbabsiar answered: "[d]oesn't matter how you do it. I mean, if you do it by himself, kill is better, but sometime, you know, you have no choice, is that right?" (*Id.*). On numerous occasions during the July 17 meeting, Arbabsiar made it clear that the assassination needed to go forward, even if doing so would cause mass casualties. (*Id.*). For example, Arbabsiar told CS-1: "They want that guy [the Ambassador] done [killed], if the hundred go with him, fuck 'em." (*Id.*). In a similar vein, Arbabsiar and CS-1 also discussed the means by which the Ambassador would be killed. CS-1 said: "I'm gonna blow him [the Ambassador] up or shoot him, whatever you want." Arbabsiar responded: "Yeah, it doesn't matter . . . [w]hatever is easy for . . . how is possible for you." (*Id.*).

Arbabsiar repeatedly reassured CS-1 that CS-1 and CS-1's men would indeed be paid for killing the Ambassador. (PSR ¶ 20). Arbabsiar told CS-1 to tell the people working for CS-1 that Arbabsiar could "guarantee the money . . . I [Arbabsiar] got the money coming." Arbabsiar emphasized that "this is politics, ok . . . it's not like, eh, personal . . . This is politics, so these

people [Arbabsiar's co-conspirators in Iran] they pay this government ... he's got [Arbabsiar's cousin has got] the, got the government behind him . . . he's not paying from his pocket." (*Id.*). To facilitate payment, at one point during the July 17 meeting, CS-1 gave Arbabsiar "the account number ... in [a U.S. bank] ... and the U.S. routing number" - the unique number associated with the United States bank account into which Arbabsiar could arrange for payment to be made to CS-1 for the assassination of the Ambassador. (*Id.*).

At the end of the meeting, Arbabsiar reiterated that the potential for civilian casualties should not dissuade CS-1 from killing the Ambassador. (PSR ¶ 21). Arbabsiar instructed CS-1 that if CS-1 could not kill the Ambassador when he was outside, by himself, CS-1 should kill the Ambassador while he was in the restaurant: "[l]et it hit the restaurant. If, if you can do it outside, do it. If not, restaurant, hit it, it's ok." (*Id.*). In response, CS-1 noted that there were "from a hundred, a hundred and fifty [people in the restaurant]" and "buildings on the sides," and "senators [U.S. Senators who dine there]," all of which Arbabsiar dismissed as "no problem" or "no big deal." (*Id.*).

On or about July 20, 2011, Arbabsiar left Mexico and returned to Iran. (PSR ¶ 22).

### D. Arbabsiar Meets with Iranian Military Representatives and Confirms Payments to CS-1

Upon his return to Iran, Arbabsiar met a number of occasions in Tehran with Shakuri and a third individual, whom Arbabsiar understood was a high-ranking member of the Qods Force (hereinafter "Iranian Official #2"). (PSR ¶ 23). Arbabsiar also met routinely on a one-on-one basis with Shakuri. (*Id.*). During these meetings, the following occurred, among other things:

a. Arbabsiar advised Shakuri and Iranian Official #2 that the plan with regard to the Ambassador was to blow up a restaurant in the United States frequented by the Ambassador

and that in light of that plan numerous people, in addition to the Ambassador, could be killed. Arbabsiar's Iranian military co-conspirators approved the plan.

b. Arbabsiar was instructed to use code words when communicating with Shakuri while conducting the operation against the Ambassador. For example, Arbabsiar was instructed to use the code word "Chevrolet" for the Ambassador assassination plot.

c. A down-payment of $100,000 to CS-1 for the murder of the Ambassador was approved.

d. Shakuri advised Arbabsiar that the leader of the Qods Force (hereinafter "Iranian Official #3"), was aware of what Arbabsiar was doing and that Arbabsiar could meet with Iranian Official #3 in the future. (*Id.*).

On August 1, 2011, Arbabsiar caused an overseas wire transfer of $49,960 to be sent through Manhattan to the FBI undercover bank account (the "UC Bank Account") that CS-1 had identified to Arbabsiar. (PSR ¶ 24). On August 6, 2011, Arbabsiar spoke with CS-1 by telephone. (*Id.*). During the conversation, Arbabsiar said that he had sent the other half of the down payment the previous day. (*Id.*). On August 9, 2011, Arbabsiar caused another overseas wire transfer of $49,960 to be sent through Manhattan to the UC Bank Account. (*Id.*). On August 11, 2011, Arbabsiar spoke with CS-1 on the telephone. (*Id.*). During the call, Arbabsiar asked CS-1 whether he had received the second half of the down payment. (*Id.*).

### E. September 2011: Arbabsiar Returns to Mexico

On September 2, 2011, Arbabsiar spoke with CS-1 on the telephone. (PSR ¶ 25). CS-1 recorded the conversation. (*Id.*). During the telephone call, Arbabsiar inquired as to whether the arrangements to kill the Ambassador were still under way. (*Id.*). Arbabsiar then explained to CS-1 that after CS-1 and CS-1's team assassinated the Ambassador, CS-1 would make money

from that and other projects with Arbabsiar and his Iranian military associates. (*Id*.). Arbabsiar stated, "once we do this one, you gonna open a [U/I] like, uh . . . you got the number for the safe" and "[o]nce you open the door, that's it. You know what I mean? ... [y]ou don't have to worry about anything." (*Id*.).

On September 12, 2011, Arbabsiar spoke with CS-1 on the telephone. (PSR ¶ 26). During the telephone call, Arbabsiar advised CS-1 that CS-1 would be paid $1.5 million for the assassination of the Ambassador, as they had discussed before: "the number is gonna stay the same thing [o]ne and a half . . . ." (*Id*.). Arbabsiar assured CS-1 that in the future, CS-1 could prepare for the additional attacks previously discussed between them, but that CS-1 first needed to assassinate the Ambassador. (*Id*.). Arbabsiar also noted that CS-1's first task – the assassination of the Ambassador – was designed as a test run, with future assignments to follow from Arbabsiar's Iranian military associates if the assassination was successful ("[t]he first one they just want it . . . for test"). (*Id*.).

On September 20, 2011, Arbabsiar again spoke with CS-1 over the telephone. (PSR ¶ 27). During the call, CS-1 stated that he wanted Arbabsiar and his associates to make an additional payment of half of the total payment for the assassination or for Arbabsiar to personally come to Mexico to serve as collateral for the final payment. (*Id*.). Arbabsiar ultimately agreed to travel to Mexico to guarantee payment for the Ambassador's assassination. (*Id*.).

In late September 2011, Arbabsiar met with Shakuri in Tehran. (PSR ¶ 28). Arbabsiar explained that CS-1 wanted either to receive half of the money previously promised for the completion of the Ambassador murder, or to have Arbabsiar travel back to Mexico as a guarantee of payment. (*Id*.). Shakuri advised Arbabsiar that he and his associates would not

give any more money to CS-1 before the Ambassador was assassinated, and warned Arbabsiar against traveling back to Mexico. (*Id.*). Shakuri said that Arbabsiar was responsible for himself if he did travel. (*Id.*). Shakuri then told Arbabsiar that if Arbabsiar did travel to Mexico, he was to get in contact with Shakuri via telephone after his arrival in Mexico so that Shakuri could be sure Arbabsiar was well. (*Id.*).

On September 28, 2011, Arbabsiar flew to Mexico from Iran via Germany. (PSR ¶ 29). Arbabsiar was denied entry into Mexico, and was re-routed back to Germany through John F. Kennedy International Airport ("JFK") on September 29, 2011. (*Id.*). Arbabsiar was arrested after he disembarked from the plane at JFK. (*Id.*).

After his arrest, over the course of approximately ten days, Arbabsiar gave detailed *Mirandized* statements about his crime to FBI agents. During the course of his post-arrest statements, Arbabsiar acknowledged his role in the plot to assassinate the Ambassador and described the involvement of his co-conspirators in Iran. Arbabsiar also agreed to place recorded phone calls to Shakuri. The recorded calls were later used by the Government to charge Shakuri in the Ambassador plot. After placing several calls, however, Arbabsiar refused to continue to assist law enforcement.

## IV.    Arbabsiar's Guilty Plea and the PSR

On October 18, 2012, the defendant pleaded guilty pursuant to a plea agreement to a three count information which charged him with traveling in foreign commerce and using interstate and foreign commerce facilities in the commission of murder-for-hire, and conspiracy to do so, in violation of Title 18, United States Code, Section 1958, and conspiring to commit an offense against the United States, namely, an act of terrorism transcending national boundaries, in violation of Title 18, United States Code, Sections 2332b and 371. During his plea, the

defendant admitted, among other things, that he had agreed with officials in the Iranian military to cause the assassination of the Ambassador while the Ambassador was in the United States. Arbabsiar also admitted that he had agreed to pay $1.5 million to an individual (CS-1) in order to murder the Ambassador. Arbabsiar further acknowledged that he had arranged for $100,000 to be wired to CS-1 as a down payment for the murder.

On April 19, 2013, the Probation Office issued its final Presentence Investigation Report ("PSR"). The PSR calculates an offense level of 43 and a Criminal History Category of VI, which incorporates the terrorism enhancement pursuant to U.S.S.G. § 3A1.4. The Probation Office's Guidelines calculation is not in dispute. The PSR notes that the resulting Guidelines range is 25 years' imprisonment in light of the statutory maximum penalties for the offenses to which the defendant pleaded guilty. The Probation Office recommends a sentence of 25 years' imprisonment. In support of its recommendation for the maximum statutory sentence, the Probation Office stated:

> The defendant's participation in the instant offense and his disdain for the lives of potential innocent victims is disturbing. While we do not believe any mental health issues led him down this path, his motivation to involve himself in such a horrific crime is unclear. Regardless, it is difficult to consider anything but a lengthy term of imprisonment. We hope that such a sentence could serve as [a] deterrent to others who are considering such acts on U.S. soil. The guideline range of imprisonment calls for a life sentence, however, the statutory maximum term of incarceration is 300 months. For such a significant crime, we believe that this term of incarceration conforms with the purposes set forth in 18 U.S.C. § 3553(a).

PSR at 27.

<u>**ARGUMENT**</u>

**A.     The Governing Legal Framework**

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id*. § 3553(a)(2); "the kinds of sentences available," *id*. § 3553(a)(3); the Guidelines range itself, *see id*. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id*. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id*. § 3553(a)(6); and "the need to provide restitution to any victims," *id*. § 3553(a)(7). *See Gall* v. *United States*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the applicable Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita* v. *United States*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

**B.     The Seriousness of the Offense Necessitates a Sentence of 25 Years' Imprisonment**

The nature of Arbabsiar's offense merits a 25-year sentence. Arbabsiar plotted to murder the Saudi Arabian Ambassador to the United States with members of the Iranian military while the Ambassador was on American soil, indeed, in America's capital. This alone was an extremely serious offense.

Moreover, the Ambassador would not have been the only victim in this plot. As Arbabsiar repeatedly acknowledged to CS-1, a large number of bystanders who had done nothing

other than chose to eat in a particular restaurant were very likely to be killed as a result of the assassination of the Ambassador.  Nonetheless, Arbabsiar quickly dismissed the significance of those additional civilian casualties and on numerous occasions demonstrated a callous disregard for all those who would be killed.  For Arbabsiar, the execution of the Qods Force mission was paramount.  As Arbabsiar told CS-1, "[t]hey want that guy [the Ambassador] done, if the hundred go with him, fuck 'em."  (PSR ¶ 19).  Similarly, on July 17, 2011, Arbabsiar instructed the CS-1 that if CS-1's purported associates could not kill the Ambassador when he was outside and alone, CS-1's associates should kill the Ambassador in a restaurant that the Ambassador frequented which would be filled with civilians.  (PSR ¶ 21).  Arbabsiar told CS-1 that killing innocent bystanders, including U.S. Senators, who CS-1 suggested would likely be at the restaurant, was "no problem" and "no big deal."  (*Id*.).

In addition, Arbabsiar was not a passive participant in this scheme.  Rather, Arbabsiar repeatedly took critical steps of his own volition to ensure the success of this plot.  Among other things, Arbabsiar traveled on multiple occasions from Iran to Mexico, he recruited CS-1 to carry out the assassination, and he arranged for CS-1 to be paid $100,000 as a down-payment to secure CS-1's agreement to do so.  When it became clear that CS-1 would not carry out the plot without human collateral (*i.e.*, someone to serve as a personal guarantee to ensure that CS-1 would be paid for the completed assassination), Arbabsiar traveled to Mexico.  Indeed, Arbabsiar was so intent on seeing the plot through to completion that he traveled to Mexico despite being cautioned not to do so by his Qods Force handler, Shakuri.  (PSR ¶ 28).  Arbabsiar's commitment to engage in and complete the mission, over several months, with a full understanding of the carnage contemplated only adds to the appalling nature of the offense.  His motive, in part, may have been financial.  Arbabsiar, in his post-arrest statements, told law

enforcement that in addition to the $25,000 he was given by the Qods Force for operational expenses, he demanded at least $1,000,000 for his involvement in the plot.

Finally, the nature of Arbabsiar's offense is especially serious, considering that he engaged in this crime with members of the military of a country hostile to the United States and targeted a diplomat working the United States in an official capacity. The Qods Force is a deadly paramilitary group that is part of the IRGC. (PSR ¶ 10). It has a history of engaging in terrorist acts across the globe, including against Coalition Forces in Iraq, and of supporting the Taliban. (*Id.*). This plot, had it been successfully completed, would not only have killed the Ambassador and numerous innocent bystanders, but also severely impacted international and diplomatic relationships of the United States. The plot was thwarted only because the person Arbabsiar recruited to assist his co-conspirators happened to be working as a source for law enforcement.

The Guidelines take into account the seriousness of the offense, in part, through the effect of the "terrorism enhancement" at Section 3A1.4. As Judge Walker stated in his concurrence in *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), the terrorism enhancement reflects Congress' intent that defendants convicted of terrorism offenses serve sentences appropriate to their uniquely dangerous crimes. Judge Walker wrote:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*Stewart*, 590 F.3d at 172-73 (quoting *United States* v. *Meskini,* 319 F.3d 88, 91-92 (2d Cir. 2003)). To vary downward to the extent requested by the defense would thwart Congress's

intent to ensure that acts of terrorism are severely punished and disregard the nature of the defendant's conduct.

### C.     A 25-Year Sentence is Appropriate to Serve the Purpose of Deterrence

A sentence of 25 years in this case is also necessary "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). The investigation has revealed that Arbabsiar did not act alone but rather was working with high-level members of the Qods Force. The Qods Force was seeking – and easily found in Arbabsiar – an operative willing to carry out a brazen attack on a foreign diplomat on American soil. A 25-year sentence in this case is necessary to deter like-minded individuals – those who might for financial or ideological purposes, willingly engage in acts of violence in the United States, or against United States interests elsewhere. The Qods Force here chose a United States citizen who could easily travel to and from the United States to carry out this assassination plot. A lengthy sentence is necessary to deter other individuals who might be willing to engage in similar acts of terrorism at the request of the Qods Force, the request of another similar organization, or on their own initiative. Indeed, the need for deterrence is especially important in the context of a terrorism offense. *See Stewart*, 590 F.3d at 181 (Walker, J., concurring) ("In no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life.").

### D.     A Variance is Unwarranted

Defense counsel makes several arguments in favor of a sentence well below the 25-year statutory maximum. These arguments should be rejected.

#### 1.     Arbabsiar's Psychiatric Assessment

The defense argues that Arbabsiar suffers from Bipolar II Disorder, which "contributed" to the defendant's willingness to participate in the assassination plot. (Def. Mem. at 8). In

support of this argument, defense counsel relies on a report prepared by Dr. Michael B. First, dated April 16, 2013 ("4/16/13 First Rpt."). Dr. First does not contend that the defendant suffered from psychosis or was otherwise unable to determine right from wrong when he made the decision to engage in the assassination plot (or at any time during the six-month duration of the scheme). Instead, the defense claims that Arbabsiar's conduct was influenced by "a mood disturbance" (albeit not one identified as the most serious of the "mood disturbances" in the Diagnostic and Statistical Manuel of Mental Disorders). Arbabsiar's "mood disturbance," according to the defense, "increased [Arbabsiar's] vulnerability" to engaging in this crime and "impaired his ability to appropriately weigh the consequences of his actions." (4/16/13 First Rpt. at 15).

Dr. First concludes that during the period of the offense conduct Arbabsiar experienced a hypomanic episode and suffered hypomanic symptoms until he was incarcerated.[2] According to Dr. First, a hypomanic episode is characterized by a number of possible factors, at least three of which must be present, including: (i) a "distinct period of abnormally and persistently elevated, expansive, or irritable mood lasting at least four days," (ii) "decreased need for sleep," (iii) "more talkative than usual," (iv) "subjective experience that thoughts were racing," (v) "distractibility," (vi) psychomotor agitation," (vii) "excessive involvement in pleasurable activities which have a high potential for painful consequences." (*Id*. at 12). Dr. First distinguishes between a hypomanic episode and a manic episode as follows:

> In terms of duration, a manic episode must have a minimum duration of a week, whereas a hypomanic episode can be diagnosed for episodes lasting only four days. Given that Mr. Arbabsiar's episode of elevated mood lasted for months, the

---

[2] Dr. First concludes that Arbabsiar has Bipolar II Disorder, which is characterized by a history of "at least one major depressive episode and one hypomanic episode." (4/16/13 First Rpt. at 11).

differentiating factor in his case is the degree of functional impairment. While the mood disturbance in individuals with a hypomanic episode must result in a change in functioning that is observable by others, the episode must not be severe enough to cause marked impairment in social or occupational functioning, or to necessitate hospitalization. If it were, it would be diagnosed as a manic episode.

(*Id.*).

It is worth nothing that the defense's diagnosis has shifted. They first describe Arbabsiar's conduct as manic, (*see* July 13, 2012 Report of Dr. Michael First at ¶¶ 21, 27, submitted in connection with the defendant's motion to suppress, the "7/13/12 First Rpt."), and later describe the defendant's conduct during the same period as showing "hypomanic symptoms" (*see* 4/16/13 First Rpt. at 14). The coincidence of the defendant's supposed "hypomanic" episode precisely with the period of his criminal activity – and at no time before or after – casts doubt on the diagnosis.

The health care professionals who have seen the defendant regularly during the 18 months he has been in custody since his arrest have reached a contrary conclusion, as has Dr. Gregory Saathoff, the Government's psychiatric expert. In their view, Arbabsiar does not suffer from Bipolar Disorder.

Even assuming Dr. First's diagnosis was correct, it would not warrant a sentence below the 25-year statutory maximum. Arbabsiar does not and cannot claim that he did not know what he was doing was wrong during this alleged hypomanic period. Nor does Arbabsiar claim that his purported disorder rendered him unable to refuse to participate in the plot or to withdraw from the plot prior to his arrest. In fact, even Dr. First recognizes that the defendant's mental condition was not "severe enough to cause marked impairment in social or occupational functioning, or to necessitate hospitalization." In light of the limited impact of this purported

condition, it has little if any bearing on the defendant's culpability and it does not warrant a sentence below the applicable Guidelines sentence. Moreover, the condition did not limit the defendant's ability to undertake extensive international travel for meetings in Mexico, to report accurately to high-level Iranian officials the content of those meetings and to facilitate international money transfers in furtherance of a plot that the defendant well understood would lead to the deaths of scores of innocent civilians. Accordingly, any mental disorder from which he may suffer cannot justify a reduced sentence in this case. *See, e.g. United States* v. *Kottage*, No. 11-4970-cr, 2013 WL 362968, at *1-2 (2d Cir. Jan. 31, 2013) (upholding substantive reasonableness of sentence where district court declined to grant departure based on alleged diminished mental capacity due to bipolar disorder).

### 2.    Arbabsiar's Age

The defense asks for a ten-year sentence in light of the defendant's age, claiming, among other things, that a 25-year sentence is effectively a life sentence and that the defendant poses virtually no risk of recidivism were he to be released after ten years, at age 65. (Def. Mem. at 19-22). As an initial matter, the Government's plea offer reflects consideration for Arbabsiar's age. Arbabsiar was charged in an indictment with offenses that carried a maximum penalty of life imprisonment; the charges in that indictment were supported by overwhelming evidence, even absent Arbabsiar's post-arrest confession. Therefore the plea agreement – which caps his exposure at 25 years' imprisonment – already recognizes Arbabsiar's advanced age. But more importantly, the defendant's heinous conduct warrants a 25-year sentence despite his age, and his crimes are such that, as set forth above, it is appropriate to incapacitate him for that period, to ensure that he poses no risk upon release. Moreover, the need for general deterrence calls for a sentence of that length and to severely reduce the defendant's sentence in a case of this nature

due to his age and health is not appropriate.  *See Stewart*, 590 F.3d at 183 (Walker, J.,

concurring) ("Advancing age and treatable medical conditions are not normally a ticket to

overwhelming leniency, and this case is no different from the norm in that respect.").

### 3.     Arbabsiar's Attempt to Cooperate

Defense counsel also argues that Arbabsiar's assistance to the Government following his

arrest demonstrates his "sincere remorse," that because he is remorseful he will not re-offend and

therefore that a sentence of ten years is sufficient.  (Def. Mem. at 23).  To the contrary,

Arbabsiar's assistance to the Government does not warrant a sentence below the 25-year

statutory maximum.  First, Arbabsiar's cooperation, at best, was incomplete.  While Arbabsiar

spent approximately ten days describing to law enforcement agents his involvement and that of

his Iranian military co-conspirators in the assassination plot, and placed several recorded

telephone calls to his co-conspirator Shakuri at the direction of the agents, Arbabsiar thereafter

abruptly refused to cooperate further despite the Government's request that he continue to do so.[3]

Nor was Arbabsiar available to the Government as a testifying witness against his co-

conspirators.  Therefore, Arbabsiar's assistance to the Government was ultimately of limited

usefulness in connection with the prosecution of other wrongdoers.

Second, and perhaps more importantly for these purposes, Arbabsiar's limited

cooperation did not represent a determination to make a clean break with his past or to

dramatically change his life in a manner that reflects true remorse.  Indeed, Arbabsiar not only

---

[3] Defense counsel asserts that the Government declined Arbabsiar's efforts to work in an
undercover capacity in part because it "no doubt realiz[ed] [the defendant] was mentally ill . . . ."
(Def. Mem. at 22).  This assertion is baseless and inaccurate and should be disregarded.  The
agents working with Arbabsiar following his arrest had no concerns about his mental health.  As
set forth in the October 2012 report of Dr. Gregory Saathoff, none of the agents who were with
Arbabsiar consistently for nearly two weeks ever observed behavior suggesting that Arbabsiar
suffered from a mental illness.

decided to cease his proactive assistance prematurely, he never followed through thereafter by proffering with the Government or by making a full and complete admission to the Government about his criminal activities.  To the contrary, he filed a false affidavit in connection with his suppression motion in which he lied about the circumstances in which he came to provide information to the agents – the very circumstances he now casts as evidence of his sincere remorse.  Arbabsiar's limited cooperative efforts therefore do not call for a sentence below the 25 years of imprisonment called for by the Guidelines, because they do not reflect true remorse or otherwise suggest a lessened necessity for individual deterrence, a greater likelihood of rehabilitation or any other basis for a non-Guidelines sentence.  *See United States* v. *Fernandez*, 443 F.3d 19, 24-25, 33-34 (2d Cir. 2006) (upholding District Court's refusal to impose a non-Guidelines sentence on the basis of a defendant's "fitful" and limited cooperation).

* * *

In sum, a Guidelines sentence of 25 years is warranted in this case.  Arbabsiar plotted to assassinate the Ambassador on U.S. soil with full knowledge that doing so would likely cause mass casualties.  And he worked for months to ensure the success of this plot.  A 25-year sentence would reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and would be sufficient, but not greater than necessary to serve the purposes of sentencing.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the defendant should be sentenced to a Guidelines sentence of 25 years' imprisonment.

Dated: New York, New York
       May 2, 2013

                                Respectfully submitted,

                                PREET BHARARA
                                United States Attorney for the
                                Southern District of New York


By: _____/s/_____
        Edward Y. Kim
        Glen A. Kopp
        Stephen J. Ritchin
        Assistant United States Attorneys

Cc:    Sabrina Shroff, Esq.