

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 30, 2021

Hon. John F. Keenan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re: <u>United States</u> v. <u>Manssor Arbabsiar</u>, 11 Cr. 897 (JFK)

Dear Judge Keenan:

  The Government respectfully submits this letter in opposition to defendant Manssor Arbabsiar's motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A). Arbabsiar is serving a 25-year prison sentence for attempting to arrange the murder of the Saudi Arabian Ambassador to the United States on American soil. Although Arbabsiar is not scheduled to be released until 2033, Arbabsiar argues that he is entitled to compassionate release, relying principally on the risks presented by COVID-19. This Court should deny his motion. Arbabsiar is fully vaccinated, and early release would be inappropriate given the nature of his crime.

## I. Background

### A. Offense Conduct

  Working with members of the Islamic Revolutionary Guards Corps – Qods Force ("IRGC"), Arbabsiar plotted the murder of the Saudi Arabian Ambassador to the United States (the "Ambassador"). PSR ¶ 9. The IRGC is Iran's paramilitary force, answerable to Iran's supreme leader. *Id.* ¶ 10. In the early spring of 2011, Arbabsiar's cousin—a high-ranking member of the IRGC—approached Arbabsiar with a mission: the cousin wanted Arbabsiar to hire someone who could kidnap the Ambassador and, if successful, potentially carry out additional operations, including attacks on embassies in the United States and elsewhere. *Id.* ¶ 11. Arbabsiar told his cousin that he knew people in the narcotics business, and the cousin put Arbabsiar in touch with a close associate named Gholam Shakuri, who would help Arbabsiar arrange the operation. *Id.* ¶ 12.

  In May 2011, Arbabsiar travelled from Iran to Texas, and then went across the border to Mexico, where he met with a confidential source of the Drug Enforcement Administration ("CS-1"), who was posing as an associate of a drug-trafficking cartel. *Id.* ¶¶ 13-14. During this initial meeting, Arbabsiar asked about CS-1's knowledge of explosive and explained that he was interested in, among other things, attacking a Saudi Arabian embassy. *Id.* ¶ 14. Arbabsiar informed Shakuri about his meeting with CS-1, and Shakuri instructed Arbabsiar to see if he could finalize a deal for CS-1 to carry out the planned operation against the Ambassador. *Id.* ¶ 16.

Arbabsiar met with CS-1 in Mexico multiple times over the course of June and July of 2011. During those meetings, Arbabsiar told CS-1 that his military associates had a number of violent missions for CS-1's organization to perform, including murdering the Ambassador. *Id.* ¶ 17. CS-1 told Arbabsiar that, to kill the Ambassador, he would need a team of at least four men, and that the price for the assassination would be $1.5 million. *Id.* ¶ 18. Arbabsiar was receptive and said that $100,000 was available in Iran to pay CS-1 as a first installment. *Id.*

With the broad contours of the plan agreed upon, CS-1 turned to discussing the details of the operation. Arbabsiar confirmed that his cousin wanted CS-1 to kill the Ambassador, even if it meant bystanders would be hurt or killed. *Id.* ¶ 19. CS-1 told Arbabsiar about surveillance his team had done on the Ambassador and proposed potentially killing the Ambassador by using a bomb in a restaurant that he regularly attended. *Id.* CS-1 cautioned that there would be other people present who might be harmed during the assassination, but Arbabsiar repeatedly made clear that the assassination should go forward, even if it resulted in significant casualties. *Id.* Arbabsiar, for example, told CS-1: "They want that guy [the Ambassador] done [killed], if the hundred go with him, fuck 'em." *Id.* Later, when CS-1 described that there could be "from a hundred, a hundred and fifty [people in the restaurant]" including "senators," Arbabsiar dismissed the potential harm that might befall those bystanders as "no problem" and "no big deal." *Id.* ¶ 21.

Arbabsiar returned to Iran in late July 2011. *Id.* ¶ 22. Over the course of his stay in the country, he participated in multiple meetings with Shakuri. During those meetings, Arbabsiar informed Shakuri that the plan was to kill the Ambassador by blowing up a restaurant that he regularly attended, noting that numerous others could die in the attack. *Id.* ¶ 23. Shakuri approved the plan, and IRGC members approved a down payment of $100,000 to CS-1 for the murder. *Id.* Following that approval, Arbabsiar sent two $49,960 wire transfers to bank accounts that CS-1 had provided, and spoke to CS-1 about the money being a down payment for the murder. *Id.* ¶ 24.

During September 2011, Arbabsiar and CS-1 exchanged phone calls, during which they discussed the operation, the amount CS-1 would be paid, and the possibility for future operations. *Id.* ¶¶ 25-26. On September 20, CS-1 told Arbabsiar that, before he carried out the murder, he wanted an additional payment of half the $1.5 million he had been promised or for Arbabsiar to personally come to Mexico to serve as collateral for the final payment. *Id.* ¶ 27. Against the advice of Shakuri, Arbabsiar agreed to travel to Mexico. *Id.* ¶ 28.

On September 28, 2011, Arbabsiar flew to Mexico from Iran via Germany. *Id.* ¶ 29. Arbabsiar was denied entry into Mexico and was re-routed back to Germany through John F. Kennedy International Airport ("JFK") the following day. *Id.* When Arbabsiar disembarked from the plane at JFK, he was arrested by federal agents. *Id.* Over the course of approximately ten days following his arrest, Arbabsiar gave detailed *Mirandized* statements, in which he acknowledged his role in the plot to assassinate the Ambassador and described the involvement in his co-conspirators in Iran.

B.  **Procedural History**

On October 18, 2012, Arbabsiar pleaded guilty, pursuant to a plea agreement, to a three-count Information that charged him with traveling in foreign commerce and using interstate and

foreign commerce facilities in the commission of murder-for-hire, and conspiracy to do so, in violation of Title 18, United States Code, Section 1958, and conspiring to commit an offense against the United States, namely, an act of terrorism transcending national boundaries, in violation of Title 18, United States Code, Sections 2332b an 371. *Id.* ¶ 6.

In the presentence report issued following the plea, the Probation Office calculated an offense level of 43 and a Criminal History Category of VI, which incorporated the terrorism enhancement in U.S.S.G. § 3A1.4. PSR ¶ 6. Based on those calculations, the applicable Guidelines range was life imprisonment. *Id.* But because the statutory maximum sentences for the three counts of conviction, if those sentences were imposed consecutively, was 25 years' imprisonment, the applicable Guidelines sentence was 25 years' imprisonment. *Id.*

This Court held Arbabsiar's sentencing hearing on May 30, 2013. Dkt. 62. After hearing from the parties, this Court adopted the Guidelines calculation from the pre-sentence report, noting that the Guidelines range was "merely advisory." *Id.* at 11-12. This Court then imposed the statutory maximum term of 25 years' imprisonment. *Id.* at 15. Explaining the rationale for that sentence, this Court emphasized that, if carried to fruition, Arbabsiar's plot likely would have resulted in mass casualties and the assassination of a foreign diplomat on American soil. *Id.* at 12-13. This Court also explained that, "[i]n a case like this, deterrence is of supreme importance" because "[o]thers who may have financial or political purposes in engaging in acts of violence against the United States or its interests must learn the lesson that such conduct will not be tolerated." *Id.* at 14-15.

### C. Arbabsiar's Compassionate Release Motion

To date, Arbabsiar has served just under 10 years of his sentence. According to the Bureau of Prisons, his estimated release date is February 6, 2033. He is currently in custody at FCI Yazoo City's medium-security facility ("Yazoo City"). According to the Bureau of Prisons ("BOP"), over the course of the pandemic, a total of 167 inmates at Yazoo City have tested positive for COVID-19 and recovered. *See* BOP, COVID-19, https://www.bop.gov/coronavirus/. Arbabsiar's medical records show the he is one of those inmates who tested positive and subsequently recovered. Ex. 1, at 15. The BOP reports that there are currently no COVID-19 cases among inmates and six among staff. *See* BOP, COVID-19, https://www.bop.gov/coronavirus/.

Despite the substantial amount of time remaining on his sentence, in November 2020 Arbabsiar filed a motion with the Warden of his facility, arguing that he is entitled to compassionate release. He claimed that his case presented "extraordinary and compelling" reasons for immediate release because of the risk that he would contract, and suffer complications from, COVID-19. The Warden did not act on Arbabsiar's motion.

Arbabsiar received Pfizer's version of the COVID-19 vaccine on March 9 and March 30, 2021. *See* Ex. 2, at 32. On April 14, 2021, he filed the instant motion for compassionate release. Despite being vaccinated, Arbabsiar principally argues that his case presents an "extraordinary and compelling" reasons for release because he is at a heightened risk of suffering complications from COVID-19. Specifically, Arbabsiar cites his high blood pressure, age, and weight, as factors that place him at an elevated risk. Arbabsiar also claims that, if sentenced today, this Court could not

have ordered that his sentences run consecutively. Finally, Arbabsiar claims that early release would be consistent with the § 3553(a) factors because of his rehabilitation in prison and his lack of a criminal history before the instant offenses.

## II.  Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, a court "may not modify a term of imprisonment once it has been imposed except" that:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure by the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Prior to the passage of the First Step Act, the Sentencing Commission issued a policy statement identifying several "extraordinary and compelling reasons" for a sentencing reduction and authorizing the Bureau of Prisons to identify "extraordinary and compelling reasons other than" those the Sentencing Commission had spelled out. *See* U.S.S.G. § 1B1.13.

In a recent decision, the Second Circuit held that the Sentencing Commission's policy statement applies when the Bureau of Prisons files a motion for compassionate release on a defendant's behalf. *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2000). But because that policy statement is not, by its plain terms, "'applicable' to compassionate release motions brought by defendants" directly in federal court, the statement "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling." *Id.*

Finally, even if a defendant satisfies the "extraordinary and compelling reasons" requirement, the Court must separately consider the § 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A). That analysis "requires an assessment of whether the relevant factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release . . . [and] whether compassionate release would undermine the goals of the original sentence." *United States v. Daugerdas*, 9-cr-581 (WHP), 2020 WL 2097653, at *4 (S.D.N.Y. May 1, 2020); *see United States v. Suero*, 11-cr-84 (PAE), Dkt. 52 (S.D.N.Y, Aug. 6, 2020) (denying motion for compassionate release even though the defendant had shown "extraordinary and compelling reasons").

## III.  Discussion

This Court should deny Arbabsiar's motion. He has failed to show an "extraordinary and compelling" reason for early release: His risk of contracting a serious case of COVID-19 is low because he has already recovered from one bout of the virus and is now fully vaccinated. Early release would also be inconsistent with the § 3553(a) factors. Arbabsiar plotted to murder a foreign

ambassador on American soil and kill or maim many bystanders in the process. He received a 25-year sentence for his crime and has served less than half of that prison term. Granting his request for release would leave him with a prison term that is not commensurate with the severity of his offense and would undermine the deterrent effect of this Court's original sentence.

### A. Arbabsiar Has Not Demonstrated An "Extraordinary And Compelling" Reason For Immediate Release.

Arbabsiar's primary argument—that he is at a heightened risk of suffering complications if he contracts COVID-19—is not an "extraordinary and compelling" reason for release because he has already been fully vaccinated.

During the pandemic, the Government has acknowledged that an *unvaccinated* inmate who presents a medical risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents an "extraordinary and compelling" reason for early release. The Government recognizes that Arbabsiar suffers from high blood pressure and is overweight—both factors that the CDC has recognized increase the risk of complications from COVID-19.

Arbabsiar's circumstances, however, are markedly different now than they were earlier in the pandemic. In March of this year, he received two doses of the Pfizer vaccine. The FDA has approved that vaccine for emergency use, based on its conclusion that, in extensive testing, the vaccine was 95% effective in preventing COVID-19 infection, including in participants with medical comorbidities associated with high risk of severe COVID-19 disease. *See* FDA Decision Memorandum, Pfizer – Dec. 11, 2020, https://www.fda.gov/media/144416/download.

Various studies continue to confirm the efficacy of the vaccines. For instance, on April 1, 2021, Pfizer reported its follow-up study on the 44,000 participants in its Phase 3 trial. It found that the vaccine was 91.3% effective against COVID-19, measured seven days through up to six months after the second dose, across age, gender, race, and ethnicity demographics, across participants with a variety of underlying conditions, and during a period through March 13, 2021, when variants were circulating. Pfizer further found that the vaccine was 100% effective against severe disease as defined by the CDC and 95.3% effective against severe disease as defined by the FDA. *See* https://www.businesswire.com/news/home/20210401005365/en/.

The CDC likewise recently reported on the effectiveness of the Pfizer and Moderna vaccines in preventing infection and concluded that the data "reinforce CDC's recommendation of full 2-dose immunization with mRNA vaccines. COVID-19 vaccination is recommended for all eligible persons . . . ." "Interim Estimates of Vaccine Effectiveness," https://www.cdc.gov/mmwr/volumes/70/wr/mm7013e3.htm (Mar. 29, 2021).

With the vaccine, then, Arbabsiar faces a substantially reduced likelihood of contracting COVID-19 or of suffering severe complications from the virus if he comes down with a case notwithstanding his vaccination. Accordingly, courts in this District have concluded that, after being vaccinated, a defendant's risk of contracting COVID-19 no longer presents an "extraordinary and compelling" reason for early release. *See, e.g.*, *United States v. Reiter*, No. 87-

Page 6

CR-132 (VSB), 2021 WL 1424332, at *8 (S.D.N.Y. Apr. 15, 2021) ("Because [the defendant] has been vaccinated, [the defendant's] health conditions and the spread of COVID-19 at FCI Allenwood Low no longer present an 'extraordinary and compelling reason' for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i).") (citing *United States v. Pabon*, No. 17 Cr. 312 (JPC), 2021 WL 603269, at *3–4 (S.D.N.Y. Feb. 16, 2021); *United States v. Johnson*, No. 94 Cr. 631 (PGG), 2021 WL 640054, at *5 (S.D.N.Y. Feb. 18, 2021)); *United States v. Sixto Valdez Roman*, No. 14 Cr. 761 (PAC) (S.D.N.Y. Apr. 14, 2021) (Doc. No. 35). Arbabsiar's case should not be treated differently; he does not present any reason to believe that he is particularly susceptible to COVID-19 despite being vaccinated. Indeed, his brief does not even acknowledge the fact that he has received the vaccine.

Arbabsiar raises two additional arguments for early release, neither of which rise to the level of "extraordinary and compelling" circumstances. First, Arbabsiar contends that his time in prison has been significantly more punitive because of pandemic-related lockdowns. The Government does not dispute that, during the pandemic, life in prison has been significantly more difficult than usual. But that is neither "extraordinary," nor a reason for early release in this case. Nearly all inmates have experienced similarly difficult stretches during the pandemic, lockdowns will lift as vaccination rates increase, and the more difficult circumstances Arbabsiar has faced do not warrant what would amount to a more than 12-year reduction to his sentence. Arbabsiar's other argument fairs no better. Arbabsiar contends that, if he were sentenced today, the Court would not be permitted to run his sentences consecutively, citing the Supreme Court's decision in *Alleyne v. United States*, 570 U.S. 99 (2013). Arbabsiar is mistaken: *Alleyne* and its predecessor, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), held that a jury must find any facts that increase the statutory maximum or mandatory minimum for an offense. There were no facts at issue in Arbabsiar's case that altered the statutory maximum sentences for his crimes, and *Alleyne* and *Apprendi* do not constrain the Court's authority to decide that the sentences should run consecutively.

In short, Arbabsiar has not presented any "extraordinary and compelling" reasons that he should be granted immediate release from custody, so this Court should deny his motion.

**B.  The Section 3553(a) Factors Require Denying Arbabsiar's Motion.**

Even if Arbabsiar could identify an "extraordinary and compelling" reason for early release, this Court should still deny his motion. Whether an "extraordinary and compelling" reason exists is only "[t]he threshold question." *Daugerdas*, 2020 WL 2097653, at *2. As Section 3582(c)(1) states, courts "must also consider[] the factors set forth in section 3553(a)." *Id.* at *4. Those factors include, *inter alia*: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (b) to afford adequate deterrence to criminal conduct; and (c) to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a).

Reducing Arbabsiar's sentence to time served would "undermine the goals of the original sentence," and so would be inconsistent with the § 3553(a) factors. *United States v. Ebbers*, 2020 WL 91399, at *7 (S.D.N.Y. Jan 8, 2020). Arbabsiar has thus far served less than half of his 25-

year sentence for this crime; indeed, he has served less time than many defendants serve for common drug-trafficking and violence offenses. Granting Arbabsiar's motion would result in a sentence that is incommensurate with the nature of his offense and his cavalier attitude toward causing massive suffering. Arbabsiar conspired with the military wing of a foreign Government to kill the Saudi Arabian ambassador on American soil, in a manner likely to cause substantial casualties among bystanders. If carried through to fruition, Arbabsiar's crime would have resulted in innocent Americans losing their lives and suffering substantial pain and suffering. It was also likely to have significant repercussions for American foreign policy and the geopolitical situation in the Middle East. Arbabsiar showed no qualms about pushing ahead with the scheme. He repeatedly told CS-1 that CS-1 should go ahead with the attack regardless of the casualties it might cause. And he did not intend to stop participating in terrorism with the killing of the Ambassador: Arbabsiar informed CS-1 that killing the Ambassador would likely be the beginning of a relationship that could involve other attacks, including attacks on embassies.

Granting Arbabsiar's request for release would also undermine the deterrent effect of this Court's original sentence. As this Court explained, in cases like Arbabsiar's, "deterrence is of supreme importance" because "[o]thers who may have financial or political purposes in engaging in acts of violence against the United States or its interests must learn the lesson that such conduct will not be tolerated." Dkt 62 at 14-15. By sentencing Arbabsiar to the statutory maximum term of 25 years' imprisonment, this Court sent a clear message that any other people who might consider committing similarly heinous crimes should expect to be punished to the full extent of the law. Allowing Arbabsiar to walk free having served less than half that sentence would seriously undermine that deterrent effect.

### IV. Conclusion

For the foregoing reasons, the Government respectfully requests that this Court deny Arbabsiar's motion with prejudice.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

by: _____

Thomas S. Burnett
Assistant United States Attorney
(212) 637-1064